# New York & Pennsylvania Telephone & Telegraph Company, Appellant, *v.* Coudersport Borough.

*Telegraph and telephone companies—License tax—Inspection—Costs of inspection—Act of April 17, 1905, P. L. 183—Boroughs.*

1. Under the Act of April 17, 1905, P. L. 183, relating to license fees imposed by municipalities upon public service corporations which have poles, wires, conduits or cables in the public streets, the court, in determining the amount of the annual license fees that may be properly charged, is controlled by the cost of inspection and regulation to the municipality.

2. Proceedings under the Act of April 17, 1905, P. L. 183, are de novo, and it is the duty of the court to hear and determine the questions involved upon the pleadings having due regard to the weight of the evidence.   There is in such a case no burden upon the petitioner to produce evidence establishing that the ordinance is unreasonable. The court is to exercise its own discretion, and not to pass upon the question whether there has been a flagrant and obvious abuse of discretion by the officers of the municipality.

3. In a proceeding under the Act of April 17, 1905, P. L. 183, a license fee of thirty cents for each pole, and $1.00 per mile for wire, is a proper charge, where it appears that there are 503 poles and twelve and seven-tenths miles of wire within the borough; and that the sum of $160.50 will fully cover all the cost to the borough of the direct inspection, general supervision and making of reports by the single policeman and the single street commissioner of the borough, together with a reasonable allowance for unforeseen contingencies.

4. Where a telegraph and telephone company makes no physical inspection of its poles and wires in a borough, the borough is entitled to make more numerous inspections and charge for the same than would be necessary if the company itself made inspections.

Argued Oct. 24, 1911.   Appeal, No. 274, Oct. T., 1910, by plaintiff, from order of C. P. Potter Co., June T., 1908, No. 108, dismissing petition to determine license fees in case of New York & Pennsylvania Telephone & Telegraph Company, now The Bell Telephone Company of Pennsylvania, *v.* Coudersport Borough.   Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD, BEAVER and PORTER, JJ.   Reversed.

Petition under the Act of April 17, 1905, P. L. 183, to determine the reasonableness of license fees. Before ORMEROD, P. J.

The opinion of the Superior Court states the case.

*Error assigned* was order dismissing the petition.

*Rodney A. Mercur,* with him *Springer H. Moore,* for appellant, cited: Kittanning Boro. v. Natural Gas Co., 26 Pa. Superior Ct. 355; Collingdale Boro. v. Tel. & Tel. Co., 33 Pa. Superior Ct. 351; Pottsville Boro. v. Gas Co., 33 Pa. Superior Ct. 480; Delaware & Atl. Tel. & Tel. Co.'s Petition, 224 Pa. 55; West Chester Boro. v. Postal Tel. Cable Co., 38 Pa. Superior Ct. 603; Pittsburg & Allegheny Tel. Co. v. Braddock, 43 Pa. Superior Ct. 456.

*Archibald F. Jones,* with him *R. R. Lewis,* borough solic-itor, *W. I. Lewis* and *Lytle F. Perry,* for appellee, cited: Western Union Tel. Co. v. Philadelphia, 22 W. N. C. 39; Mooney v. Luzerne Boro., 186 Pa. 161; West Conshohocken Boro. v. Light & Power Co., 29 Pa. Superior Ct. 7; Chester v. Western Union Tel. Co., 154 Pa. 464; Taylor Boro. v. Postal Tel. Cable Co., 202 Pa. 583; Washington Boro. v. Western Union Tel. Co., 16 Pa. Dist. Rep. 847; Union Telephone Co. v. Greenville Boro., 36 Pa. C. C. Rep. 197; Herron v. Pittsburg, 204 Pa. 509; Emery v. Philadelphia, 208 Pa. 492; Del. & Atlantic Tel. & Tel. Co.'s Petition, 224 Pa. 55; Chambersburg Boro. v. Chambersburg Gas Co., 38 Pa. Superior Ct. 311.

OPINION BY PORTER, J., March 1, 1912:

The plaintiff presented to the court below a petition averring that a dispute had arisen between it and the de-fendant borough as to whether the amount of the license fees imposed by a certain ordinance for the inspection and regulation of the poles and wires of the petitioner main-tained upon the borough streets, was reasonable, and pray-ing the court to "determine the amount of annual license

fees which should be paid to the said municipal corporation in order to properly compensate it for the necessary cost of the services performed, or to be performed, by it, for the inspection and regulation of the poles and wires" of the petitioner, under the provisions of the Act of April 17, 1905, P. L. 183. The borough filed an answer to this petition and upon the hearing of the issue thus raised evidence was taken and the court, after consideration, dismissed the petition and ordered the petitioner to pay the costs. The plaintiff appeals from that order.

The act of April 17, 1905, conferred upon the courts power to deal with and determine the amount of license fees and charges to be imposed by municipalities, upon the poles and wires of telephone and telegraph companies, under the police power, which they had not before possessed. Questions as to the validity of ordinances imposing such license fees had arisen in many cases prior to that statute, in actions at law founded upon such ordinances. The right to impose such fees or charges was sustained as an exercise of the police power, but it was uniformly held that the power could not be exercised for the purpose of raising general revenue for the support of a municipality, under the guise of a police regulation. Under the then prevailing forms of action it was often difficult for the courts to pass upon questions of fact necessary to determine whether a particular ordinance did impose a tax for revenue and thus violate the principle upon which alone the imposition could be sustained. It had been held that the municipal authorities were vested with a discretion to determine the amount of the charge necessary to compensate the municipality for the cost of police regulation, inspection and supervision. Whether the ordinance was a valid exercise of the police power was a question of law for the court, but the court could not declare an ordinance to be invalid unless upon its face, or from the duly ascertained facts, it clearly appeared that it was a revenue measure; that it involved an obvious abuse of the discretion vested in the municipal authorities. There might

be a wide margin between the limit of the charges which were clearly proper before the line was reached when it could be said that they were obviously invalid. This was the situation when the act of 1905 was passed, and this legislation grew out of the unsatisfactory methods then existing for the determination of such controversies.

The change which this statute effected in the law was clearly indicated by our Brother Head in his opinion in Delaware & Atlantic Telegraph & Telephone Co.'s License Fees, 37 Pa. Superior Ct. 151: "The learned court below was not called upon, in this proceeding, to exercise the power possessed by the courts long before the passage of the act now under consideration, viz: to set aside an ordinance because it was unreasonable, oppressive and arbitrary, resulting from an abuse of the powers of a municipality. The object of this proceeding was simply to determine, from the evidence produced, 'the amount of annual license fees which should be paid to the said municipal corporation in order to properly compensate it for the necessary cost of the services performed, or to be performed, by it, for the inspection and regulation of the poles, wires, conduits and cables, of the said telegraph company.'" That case having been appealed to the Supreme Court, the views expressed by Judge Head, as to the effect of the statute upon the pre-existing law, were by that court sustained: 224 Pa. 55. Mr. Justice Elkin, who spoke for the Supreme Court in that case, said: "The purpose of the act is stated to be the providing of a method for the determination by the courts of common pleas, with the right of appeal, of all disputes between municipalities and telegraph, telephone, light and power companies, relating to the reasonableness of the amount of license fees. In the third section of the act the duty is imposed upon the court hearing the cause to determine the amount of the annual license fees necessary to properly compensate the municipality for the cost of the services performed, or to be performed, by it, for the inspection and regulation of the poles, wires, conduits or cables

belonging to such public service corporation and located within the limits of the municipality. This is a statutory rule binding upon the courts. The amount of the license fees to be charged is measured by the cost of the service performed or to be performed during the year for municipal inspection and regulation. If there be no inspection or supervision by the municipality there can be no license fee imposed, because under such circumstances no expense would be incurred for which the statute makes the company liable. If there be inspection and supervision, the measure of liability imposed by the act is the cost of the same to the municipality. The cost of the service is the rule adopted by the legislature to guide the courts in determining the dispute between the parties. This rule cannot be ignored or lightly set aside, and it should be the central and controlling thought in the mind of the court in the determination of such disputes. Of course, when the ordinance is passed in advance of any service rendered it may and no doubt will be difficult to fix with mathematical precision the amount of the license fee before the cost of the service is definitely known, and some reasonable allowance must necessarily be made for contingencies that may happen. However, the court should see to it that under the guise of a reasonable allowance the municipality is not permitted to impose a tax for general municipal purposes, or to disregard the rule which limits the license fee to the cost of inspection. . . . The legislature fixed the rule and imposed the duty to determine all such controversies according to that rule upon the courts when proper proceedings are instituted. This rule is imperative and cannot be disregarded. . . . The learned judge of the court of common pleas treated the question upon the theory that the borough ordinance should be sustained on the presumption that it was reasonable without reference to whether it was based upon the cost of inspection or not. In this we think there was error. When the petition was filed under the act of 1905, the proceedings were de novo, and it was the

duty of the court to hear and determine the question involved upon the pleadings, having due regard for the weight of the evidence." These principles were again recognized and applied by this court in Nanticoke Borough v. Bell Telephone Co., 47 Pa. Superior Ct. 184. The effect of the act of 1905, in so far as the power and duty of the court is concerned, is forcibly illustrated by the decisions of this court in Braddock Borough v. Telephone Co., 25 Pa. Superior Ct. 544, and Pittsburg & Allegheny Telephone Co. v. Braddock Borough, 43 Pa. Superior Ct. 456. Those cases arose under the same ordinance, the first prior to the act of 1905, and it was there held that the ordinance was "a reasonable and valid exercise of the police power." The second case arose upon a petition presented to the court of common pleas, under the act of 1905, and the court reduced the charges imposed by the ordinance considerably more than one half, although it had been decided under the pre-existing law that the ordinance was of such a character that the court would not be warranted in declaring that its enactment involved an abuse of municipal discretion.

The learned judge of the court below disposed of this case as if he were exercising "the power possessed by the courts long before the passage of the act now under consideration; to set aside an ordinance because it was unreasonable, oppressive and arbitrary, resulting from an abuse of the powers of the municipality." He affirmed the fifth request of the defendant for conclusion of law, which was in the following words: "The amount of the license is in the reasonable discretion of the municipal authorities and that amount will be presumed to be reasonable until the petitioner by fair preponderance of evidence establishes the contrary." In his opinion he gives, as his reason for dismissing the petition: "We are of the opinion that the petitioner has failed to show that the fee fixed by the respondent is unreasonable and that the presumption that in the exercise of its discretion it has fixed a proper fee has not been overcome." This is

not in accord with the view expressed by the Supreme Court, in Delaware & Atlantic Telegraph & Telephone Co.'s Petition, 224 Pa. 55, that: "When the petition was filed under the act of 1905, the proceedings were de novo, and it was the duty of the court to hear and determine the question involved upon the pleadings, having due regard for the weight of the evidence." When no evidence is presented, upon either side, it might be proper for the court to dismiss the petition, for it has nothing upon which it can act; unless upon the face of the ordinance it be clearly apparent that the charge is invalid. When, however, the parties go into a hearing and the evidence fully discloses everything that the borough has done in the way of inspection and all that it intends to do, the court must proceed to discharge its duty in the manner which the pleadings and evidence warrant, under the statute. There is in such a case no burden upon the petitioner to produce evidence establishing that the ordinance is unreasonable. The court is to exercise its own discretion, expressly conferred by the statute, and not pass upon the question whether there has been a flagrant and obvious abuse of discretion by the officers of the municipality. The court below having proceeded upon an incorrect theory as to the nature of the duty which he was called upon to discharge, it devolves upon us, giving due weight to the findings of material facts by the court below in so far as there were such findings, to examine the evidence and enter such decree as to right may appertain.

The ordinance provided that the borough council should appoint one or more persons, "whose duty it shall be to inspect all the telephone, telegraph and electric light poles in Coudersport Borough and the wires thereof, at least twice each year and as many more times as the said council shall deem necessary, said inspectors to report condition of said poles and wires to said council after inspection as aforesaid." It also provided that the companies maintaining poles and wires in the street should annually make application to the burgess for license.

specifying the poles so to be maintained, and that the burgess should thereupon issue license to such applicants, of the poles designated in such application for the term of one year only, to be computed from the first day of April in each and every year.   The cost of issuing this license is properly one of the elements to be considered in determining the total charge which may properly be imposed.   The ordinance in this case, however, provided for the issuance of but a single license to each company and the cost of issuing it must, therefore, have been inconsiderable.   The evidence disclosed that, under the instructions of the council, the solitary policeman of the borough, who was on general duty from 3 P. M. to 3 A. M. seven days of the week and was paid a salary of $55.00 a month for all his services, did spend a portion of his time in inspecting the poles and wires of this appellant company.   The testimony of that officer is all that we have to throw light upon the character of the inspection which he made or the time which such inspection consumed, and from it must be ascertained the amount 'which the inspection made by him cost the borough.   He testified that, while upon duty, he "put in a certain time at it through the week when the weather was suitable, once or twice a week, anyhow for a couple of hours to go around the different parts of the town to look after the wires."   "Right here in the center of the town where my beat is I always look after it, almost every day, especially after a storm or something of that kind."   This was very indefinite, but under cross-examination he gave some additional light as to the sum total of his efforts in the way of inspection.   He there testified that he had inspected the poles and wires of the plaintiff company six times in the past year.   When asked as to how many days had been required to make each of the six trips he said: "As I told you before I only spent two or three hours in the afternoon for three or four days, and then I would wait before I went again."   This is the only thing definite as to the amount of time which he devoted to inspecting this plant which we have in

his testimony. He would spend two or three hours in the afternoon for three or four days in making one inspection, which, giving the evidence the construction most favorable to the borough, would require twelve hours, for each inspection. This was the only testimony from witnesses on behalf of the borough as to the time necessary to make an inspection. The testimony of all the witnesses called by the plaintiff did not materially contradict the testimony of the officer upon this point; they all said that to make a proper inspection of the lines would require from one and a half to two days. Again giving this testimony the construction most favorable to the borough, the officer spent twelve days in making these six inspections. The uncontradicted testimony of all the witnesses produced by the plaintiff was that the wages of a lineman, an expert in this matter, were $2.50 per day, which exceeds the rate at which this borough compensated the policeman. Allowing the borough compensation for the time of this officer at the rate at which an expert inspector would have been paid: 12 days at $2.50 per day, or $30.00, would exceed the amount which the inspection made by this policeman cost the borough. Now, in so far as the borough is entitled to compensation for the time of this officer is concerned, the only thing which he did in addition to this inspection was while patrolling his beat in the center of the town, which he testified was his general duty, he kept his eyes open so that he might observe the general conditions existing in the streets, including anything out of the ordinary in the poles and wires of the telephone, telegraph and electric light and power companies. There could be no pretense that all the time of this officer while he was engaged in patrolling his beat was devoted to inspecting the poles and wires to which he was admittedly then only giving casual attention. The officer when asked what proportion of his time from 3 P. M. to 3 A. M., being the hours he was on duty, he spent in inspection during a month, frankly answered: "Well, I never figured it up." "Q. You can't tell? A. No." There was not a scintilla

of evidence that the necessity for having this officer per-
form the general duty of patrolling his beat arose from the
fact that these poles and wires were maintained in the
street, or that their presence rendered the work of the
patrolman more difficult or extended the area within which
it became necessary to patrol the streets.  This police
officer did twice a month report to the borough council
the result of his inspections of poles and wires, and the
cost of making such reports is proper to be considered.
Apart from the services of the policeman in this matter, as
indicated above, the only other service performed, in
inspecting and regulating the lines of the appellant, which
involved the borough in any expense was performed by
the street commissioner.  That officer had, under the
instructions of the council, inspected the lines of the plain-
tiff four times, once in each of the four months immediately
preceding the hearing.  The street commissioner testi-
fied that he had made these inspections and reported the
results to the council, but he did not in his testimony in-
dicate what time it had taken him to make any one of
these inspections.  Let it be assumed that he took the
time which the testimony of the policeman and all the
other witnesses in the case indicate would have been
sufficient; two days for each inspection.  Let it be further
assumed that because the council had in the last four
months required the street commissioner to inspect the
lines monthly that it is, therefore, their intention to
cause that service to be performed with equal frequency
in the future; this would involve twelve inspections an-
nually, which would consume twenty-four days of time.
The commissioner is only paid $52.00 per month, but
allowing for his compensation at the rate which would be
paid an expert inspector, $2.50 per day, the time which
he each year devoted to inspection would cost the borough
$60.00.  The street commissioner, in addition to the time
specially devoted to inspecting the lines of the various
companies operating in the borough, while engaged in
the discharge of other duties appertaining to his office,

in passing from one part of the town to another, would in a casual way keep his eye on the poles and wires of telephone, telegraph, electric light and electric power companies, observe the condition of the streets, as affected by the pipe lines under the surface and the condition of the sidewalks; this was a part of his general duty. This is the sum total of the service which the borough has caused to be performed, or which it has given any evidence of an intention to perform in the future, in inspecting, regulating and supervising the poles and wires of this appellant. The most liberal estimate of the direct cost to the borough of inspection, exclusively, could not be over $90.00 per annum. The borough is, however, entitled to compensation for that general supervision of the poles and wires exercised by the policeman and the street commissioner while passing through the streets, in the discharge of their general duties. In determining what ought to be allowed as compensation for this general supervision, as distinguished from special inspection, it is proper to consider that the sum above mentioned would pay for eighteeen inspections of the lines annually. The borough maintains no separate organization for making these inspections and exercising supervision. The total cost of the police department of the borough is $660 per annum and the salary of the street commissioner is $624 per year; or in the aggregate $1,284. We find nothing in the testimony which would warrant a finding that any more than one-eighth part of this total sum, or $160.50, can fairly be included in determining the amount which will compensate the borough for the cost of the service which it has performed, or indicated any intention of performing, in supervising and regulating the poles and wires of the appellant. This sum will fully cover all the cost of the direct inspection, general supervision, and making of reports, by the officers, together with a reasonable allowance for unforeseen contingencies.

We are not to be understood as saying that it is in all cases a proper exercise of municipal discretion to require

an inspection of poles and wires eighteen times a year. "Reasonable latitude must be allowed municipalities in dealing with this subject, but on the other hand they should not be presumed to make useless and unnecessary inspections at the cost of the operating companies. This is always a question for the courts to determine in a proceeding instituted under the Act of April 17, 1905, P. L. 183:" Delaware & Atlantic Telegraph & Telephone Co.'s Petition, 224 Pa. 55. Each case must be determined upon its own peculiar facts, as disclosed by the evidence, and it may be that in no two cases will the cost of inspection be the same. The law imposes upon companies maintaining poles and wires in the streets, for the purpose of conducting an electric current, the duty to exercise the highest degree of care by way of inspection and maintenance. When that duty is fully discharged, the protection thus secured can be more safely relied upon than the inspection by borough officers without any technical knowledge of the business. Even in such a case, however, the duty and power of a borough to exercise police supervision and regulation still remains. When, however, it appears that a telephone or telegraph company has neglected to cause a thorough and general inspection of its lines at proper intervals, the propriety of more frequent municipal inspections is apparent. This appellant admittedly never caused any general inspection of its lines to be made. It, through its own officers, produced evidence which established that fact, and it specifically requested the court to find that fact, which the court below accordingly did. The principal reliance of this appellant, under the evidence produced by it, was upon what was called a "morning test," which consisted of a call by the operator at the central office to each subscriber who had a telephone; if this call was answered the line was reported "O. K."; if the answer of any subscriber was not satisfactory, this was indicated on a tag made out by the chief operator and given to the inspector. When the inspector received a tag indicating that any particular line was out of order

he went and examined that line and repaired it.   Now it is manifest that such a test would not reveal whether a pole was damaged or decayed, nor anything as to the condition of a wire to which no telephone was then attached. Such a wire not being in use—dead—would not be tested and it might be broken with the ends dangling in the street, in dangerous proximity to other wires carrying a deadly current.   A most significant fact, in this connection, was testified to by the district manager of the plaintiff company, who said in answer to a question: "Q. How few wires will hold up a pole even if it is entirely severed at the base?   A. One."   This "morning test" would determine whether the lines were in condition to permit of communication between subscribers, but it could not answer the purpose of a physical inspection of the poles and wires, to determine whether they were a menace to public travel upon the street.   The only other means of ascertaining the condition of their line practiced by this company is indicated by the testimony of Noble, the inspector of the company, who upon that point testified: "Q. How do you inspect the line outside of the office? A. There is no general inspection; during our other work in going from one side of the town to the other, we keep a general lookout for anything wrong or any trouble." This witness in describing what the "other work" referred to in this answer was, described how telephones were put in the houses and connected with the line and how instruments were taken out, when parties no longer desired them.   When the "morning test" indicated a defective line the inspectors went and repaired it, when a new subscriber was procured they put in his telephone, when a' subscriber dropped out his instrument was removed, and while the employees were going about town doing this work they "kept a general lookout for anything wrong or any trouble."   That general inspections of the line ought to be made by companies engaged in business of this character, and the reason for doing so, was clearly stated by one of the expert witnesses called by the appel-

lant, William Crane, electrical engineer of Erie, who being asked by the counsel for plaintiff: "Q. If in the usual course of the business inspections are made from day to day or very frequently, is there any necessity for even an annual inspection? A. By making an annual inspection you cover the entire plant, while by making special inspections as a man does in his general work, he does not see the whole plant." The evidence further disclosed that those employed by the borough to inspect the poles and wires of the plaintiff corporation frequently reported defects, and that such defects were, upon notice to the company, repaired. We cannot, in view of all the evidence in the case, hold that the number of inspections which the borough has required its officers to make is not reasonably required and necessary for the protection of the public.

The appellant has within the borough 503 poles and 12.7 miles of wires (line mileage), and a police charge of thirty cents for each pole and $1.00 for each mile of wires (line mileage) would amount to the sum of $163.60 annually. We have reached the conclusion, after due consideration of all the evidence, that the object and aim of the statute will be attained by fixing the maximum rates which the borough shall be authorized to charge as license fees, at the amount thus indicated; this will reimburse the borough for the cost of inspection and supervision by its officers, the cost of making and keeping the reports and of issuing the necessary license.

The order of the court below is reversed, the petition is reinstated, and the record is remitted to the court below with direction to enter a decree fixing the maximum sum which the borough shall be authorized to charge as license fees against the petitioner at thirty cents for each pole and $1.00 per mile for wires (line mileage), and it is ordered that the costs of this appeal and in the court below be paid one-half by the appellee and the other half by the appellant.